Filed 2/23/15  In re Logan H. CA5

**NOT TO BE PUBLISHED IN THE OFFICAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re LOGAN H., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>LOGAN H.,<br><br>    Defendant and Appellant. | F068456<br><br>(Super. Ct. No. JJD066926)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Linda K. Harvie, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Angelo S. Edralin, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

Logan H., a minor, was found by the juvenile court to have committed attempted first degree murder, kidnapping to commit robbery, robbery, a criminal threat, vehicle theft, battery, and conspiracy to commit murder. The court committed him to the Division of Juvenile Justice[1] for a maximum period of 40 years to life plus two years six months.

In this appeal, Logan argues that there was insufficient evidence to support the findings that he committed the offenses. Specifically, he maintains that evidence of his voluntary intoxication compelled a finding that the intent element was missing for each crime (except the battery). Logan further asserts that the juvenile court abused its discretion when it chose to commit him to DJJ instead of county custody; when it failed to stay any portion of the maximum confinement period pursuant to Penal Code section 654; and when it imposed consecutive rather than concurrent terms in calculating the maximum confinement period. Finally, Logan points out that the juvenile court did not state reasons on the record to support its determination of the maximum confinement period; he contends we should adopt a rule requiring juvenile courts to state such reasons.

Logan is correct in part about the Penal Code section 654 issue. As will be seen, however, the part about which he is correct affects only a small fraction of the maximum confinement period. We will order the necessary modification and direct the juvenile court to modify its commitment order accordingly and to forward the modified order to the appropriate juvenile authorities. We will reject the remainder of Logan's contentions and affirm the balance of the judgment.

### FACTS AND PROCEDURAL HISTORY

Sheriff's deputies came to a house in Exeter on the afternoon of April 4, 2013, in response to a carjacking reported by the victim, Amy K. Amy was a pizza delivery driver.

---

[1]The California Youth Authority (CYA) has been renamed California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). (Gov. Code, §§ 12838.1, 12838.5.)

She told the deputies she had gone to Logan's address in Exeter with a delivery about 25 minutes earlier. A child who came to the door told her to bring the pizza to the back of the house. When she did so, an older youth pointed a gun at her and made her lie on the ground while she was bound and blindfolded. Two others joined them and the group subjected her to a variety of threats, saying they would have to kill her with the gun or a knife or in some other way. One of the attackers said he was going to break her neck and tried to do so by holding her head in his hands and twisting it. Finally, one of the youths forced Amy to take several pills, which he said would kill her. The four took the money from Amy's delivery bag and left in her car. She got herself untied and ran to a neighbor's house, where she called the sheriff's department. She was taken to a hospital for monitoring, but was found to have only an elevated level of Tylenol.

Deputies spoke to Logan's aunt, Debbie, who had gone to Logan's house that day to check on him. When she entered, Logan grabbed her around the throat with his arm and held her until another of the youths told him to stop. Logan let her go and apologized.

Logan, the other three youths, and the stolen car were found by law enforcement in Las Vegas on April 7 and 8, 2013. Logan was 13 years old.

Pursuant to Welfare and Institutions Code section 602, the district attorney filed a juvenile wardship petition against Logan on April 15, 2013. The petition alleged seven offenses: (1) attempted premeditated murder of Amy K. (Pen. Code, §§ 187, subd. (a), 664);[2] (2) kidnapping to commit robbery (§ 209, subd. (b)(1)); (3) second degree robbery (§ 211); (4) making a criminal threat (§ 422); (5) unlawfully taking a vehicle (Veh. Code, § 10851, subd. (a)); (6) misdemeanor battery (§ 242); and (7) conspiracy to murder

---

[2]Subsequent statutory references are to the Penal Code unless otherwise noted.

Debbie (§§ 182, subd. (a)(1), 187, subd. (a)).[3]  A detention hearing was held on April 18, 2013, and Logan was ordered to remain in custody.

The jurisdictional hearing was held on July 1, 2 and 10, 2013.  Logan appeared with codefendants Wyatt V. and Ronald J., who were 14 and 13 years old, respectively, at the time of the offenses.  The fourth minor, Pete S., was 17 at the time of the offenses and was tried separately as an adult.

Amy testified that she went to Logan's house in Exeter to deliver a pizza on April 4, 2013, and Ronald answered the door.  Ronald told Amy to go to the back of the house, where his mother would pay for the pizza.  She went to the back and waited a while, and then Pete appeared with a rifle, which he pointed at her.  Pete told Amy to drop everything and get down on her knees.  Amy complied.  Wyatt came out.  Pete gave him the gun and told Amy that Wyatt would shoot her if she moved.  Pete blindfolded her and tied her wrists, feet, and elbows.  She heard the boys opening her driver's bag and taking the money out.

Pete made Amy stand up and go into the house.  He guided her into a room, closed the door, and made her sit on a bed.  She could see the face of the person in front of her if she tilted her head back.  Pete said it was nothing personal, just business; robbing delivery drivers was the way they made money.

Wyatt and Logan came into the room.  They were discussing what to do with Amy. One said they needed chloroform, but they did not have any.  Then Logan said, "[Y]eah, I'll take care of it."  He tried to break her neck:

"Q.    Tell me what he did to try to break your neck?

_____

[3]The petition does not mention Debbie by name, but it clearly indicates that she, and not Amy, is the victim in count 7.  The petition states that the overt act committed by Logan in furtherance of the conspiracy was "ENTERED VICTIM'S BROTHER'S HOME AND WAITED FOR VICTIM TO ARRIVE."  The home in question is Logan's father's home, so Logan's father is the victim's brother.  Debbie is Logan's aunt and Logan's father's sister, and thus is the victim referred to here.

4

"A.   Like in the movies.  Grabbed my face and tried to twist my neck.

"Q.   He grabbed underneath your chin with his open hand?

"A.   Yeah.

"Q.   Did he do anything with the other hand?

"A.   He attempted to grab my shoulder, but he didn't do the job. He was more focused on my face.  Just pushed it to the side.

"Q.   Did he try to twist it?  [¶]  Is that what happened?

"A.   He tried to twist it.  [¶]  But I like moved my body at the same time he did, and I was able to get a glimpse of his face.

"Q.   Okay.

"A.   At that point he was in my face, like saying a lot of stuff, saying that he could have broke my neck if he wanted to at that time.  And that he had to get me out of the house.  I had to die.  He had to get me out of the house, my body out of the house, by 5:00 before his uncle came home.

"Q.   Did he mention any way about getting your body out of the house?

"A.   At that point he said—you know, they were saying so many different ways that we can kill her.  They are throwing out ideas.  There was we can bury her under the house.  We got cement fill.  We can cut off head [*sic*].  If we cut off the head, I get my head in the trunk, just getting creative.

"Q.   When you say they, who are you speaking about?

"A.   I'm speaking about everyone in the room.  It was Pete, Wyatt, and Logan. [¶]  But Wyatt and Logan were the ones that were talking about killing."

After Logan tried to break Amy's neck, Wyatt said, "[H]old on.  This guy wants a go at him—wants a go at her before we are done."  Then someone—Amy thought it was Logan but was not sure—touched her breast and said, "[O]h, she's got nice tits."  Wyatt said he wanted to rape her with a knife.  Pete said, "[N]o, we are not going that far."

5

Logan and Wyatt searched Amy and found her car keys in her pocket.  They gave the keys to Pete, who moved the car to the back of the house.  Someone told Ronald to put blankets and food in the car.

The boys continued to discuss what they would do with Amy.  Logan said "we have to kill you," and "you can't live," because otherwise she would testify against them.  Logan also said that if he got caught, "I'm going to come after your family and I will cut up your family."  At some point, Pete said they would take the car and leave her in the house alive, but Wyatt and Logan "had a problem with it."  Ronald was being ordered around by Wyatt and Logan and never said anything threatening.

Pete left the room.  Logan told Wyatt, "[H]andle this.  Take care of it."  Then Logan left Wyatt alone in the room with Amy.  Wyatt said, "[Y]ou want a machete to the heart or I can break your neck.  Those are your choices."  There was a machete in the room; Logan had been holding it and the boys had threatened her with it.  Amy said, "[H]ow about something not painful?  Do you have any pills for overdose?"  Wyatt did have some pills, and accepted Amy's suggestion.  (A detective testified that Ronald said he found these pills in Amy's car and gave them to Wyatt.)  Wyatt fed Amy about 12 pills one at a time and gave her water to swallow them.  The pills were of different sizes and some of them were capsules.  The "last couple of them tasted a lot like aspirin."  After this, Wyatt said, "I knew we should have fucking slit her throat."  Then he left the room.  The room was empty and Amy heard her car being driven away.

After the boys were gone, Amy was able to untie herself in a few minutes.  She tried to vomit up the pills.  Then she ran to the house next door and called the police.  She succeeded in making herself vomit while at the house next door.

Debbie, Logan's aunt, testified at the jurisdictional hearing.  Debbie lived next door to her brother, Kevin H., and Kevin's son, Logan.  On the day of the incident, Debbie was cooking and needed some salt, so she prepared to go over to Kevin and Logan's house.  Before leaving, she noticed a red car parked there, so she called Kevin to ask if he knew why it was there.  He did not, and he asked Debbie to go to the house and

6

check it out.  She went, and Ronald came to the door.  Ronald told her they were waiting for a pizza and she should leave.  Debbie told him he wasn't supposed to be there, and she went in to get the salt.  Inside she saw the rifle in the corner and knew it did not belong to Kevin.  She asked who owned the gun.  Wyatt picked it up and said it was a BB gun, but Debbie believed it was not.  Debbie was preparing to leave when Logan came in through the front door.  She testified, "I knew he wasn't in his right state of mind.  To me, he seemed like he was tweaking on drugs or something like that."  Logan's pupils were dilated and Debbie smelled alcohol.  She had always known him to be loving and courteous with members of his family and had never seen him showing signs of anger or aggression.  His parents had recently been divorced.

Logan then grabbed Debbie, placing his forearm across her throat:

"He just kind of reached behind my neck and like okay, guys, here she is.  Get her now.

"And [Ronald] just said no, just go take a nap, Logan.  And Logan actually backed off like he was in a daze.  I was very concerned…. I had never seen him in that state of mind before."

Logan let Debbie go, and she left the house.  As she was walking to her house, Logan yelled to her:  "He goes I love you, Aunt Debbie.  I would never hurt you."  Then he came up and hugged her.  Ronald was there, and she prayed with them.  Debbie went in her house and Logan and Ronald went back to Kevin's house.

A short time later, Amy appeared at Debbie's house and told her what happened.  Debbie called Kevin and the police.

Detective Rodney Klassen testified for the People.  Klassen interviewed the four minors after they were arrested in Las Vegas.  Wyatt told Klassen that the four of them committed a burglary and then became concerned they would be caught.  They formed a plan to flee California using money and a car stolen from a pizza delivery driver.  They were carrying out this plan when they committed the crimes against Amy.  Wyatt described Logan grabbing Debbie and choking her and Logan trying to break Amy's neck.  Wyatt told Klassen that one of the boys said he wanted to see blood.  When

7

Klassen asked who said this, Wyatt's voice dropped to a whisper and he cried and shook, but he did not name anyone. When asked who made Amy swallow the pills, Wyatt claimed it was Ronald.

Ronald confirmed to Klassen that the boys planned to flee California because of the burglary they had committed earlier. They first planned to kill Debbie and take her car and money. Debbie did not come when expected, so they developed an alternate plan of robbing and killing a pizza delivery driver. Then Debbie did arrive after Amy was already in the house, and Ronald saw Logan attack Debbie from behind and put her in a choke hold. Ronald told Logan to stop. Wyatt said he wanted to rape Amy, and Ronald touched Amy's breast. Ronald found the pills in Amy's car and gave them to Wyatt. Later, in the car, Wyatt showed the others the empty pill bottle and said Amy should be dead by now.

When Klassen interviewed Logan, Logan also confirmed the story that the boys planned to leave California to avoid being held responsible for the prior burglary. Logan said Wyatt and Pete were the ringleaders, but all four were involved. Wyatt formulated the plan to kill Debbie. Logan admitted attacking Debbie because "he just sparked because there was so much going on." Logan also admitted he tried to kill Amy by trying to break her neck. He put one hand on her chin and one on the back of her head and twisted her head.

Because Logan and Ronald were 13, Klassen asked them a series of questions pursuant to the Supreme Court's opinion in *In re Gladys R.* (1970) 1 Cal.3d 855, 862 (*Gladys R.*) (according to § 26, minor under age 14 cannot become ward of juvenile court because of criminal offense unless minor appreciated wrongfulness of act at time of commission). Asked how the boys responded, Klassen testified that they "appeared to be very coherent and understanding of the questions and their responses indicated to me that they understood the wrongfulness of the act related to the questions that I asked them." Logan and Ronald expressed remorse to Klassen.

8

Ronald testified in his own defense. He explained that Wyatt, who was the leader of the group, had "kept bugging" him to help burglarize a house, and that he gave in and a burglary took place on April 4, 2013, the day before the attack on Amy. They stole gum, a camera, and some knives. Then on April 5, 2013, Ronald, Wyatt, Pete, Logan, and a girl named Alina went back to the burglarized house, entered it again, and took a rifle and a pellet gun. The minors took the stolen property to a vacant house across the street from the house they had burglarized. They had some alcohol and drank it. Logan "took a lot of gulps." It "was his first time" drinking, and "he kind of was not acting like himself." Wyatt, Logan, and Pete returned to the burglarized house after this, while Ronald and Alina remained behind in the vacant house. A police officer found Ronald and Alina in the vacant house and made them leave.

Later, Ronald and Alina met Wyatt, Pete, and Logan at Logan's house. The boys formed their plan to go "on the run." Wyatt believed that if they left the state, then "they couldn't get us after a couple of years" and then "we could come back." Ronald told Alina she should leave because he "didn't want her to get hurt or anything because they were on alcohol." She left.

The boys developed their first plan: "At first Wyatt and Pete planned to kill Logan's aunt and Logan said he was fine, as long as he wasn't in the room when it happened." Wyatt said he would kill her with the machete when she came in the house.

The boys formulated a second plan in which no one would get hurt, involving borrowing a friend's car. Logan and Pete left Logan's house on bicycles and returned in a car with someone named Billy. Billy was going to give them airplane tickets in exchange for the stolen rifle. Billy drove away with the gun, saying he would come back with the tickets.

Ronald smelled alcohol on Logan. Logan was acting "[a] lot different," and Ronald believed this was because of the alcohol. Ronald said, "[A]t one point he was freaking out and he was trying to hurt us. And we had to hold him down. That's where

9

one of the parts where he wasn't acting himself." They tried to tie Logan with neckties, but failed. Logan tried to take a nap.

When Debbie did not appear after an hour or two, the boys came up with the plan to order a pizza and take the delivery driver's car.

Amy was already in the house when Debbie arrived. Ronald saw Logan "put his arm around [Debbie's] throat." Logan said, "get her, get her, get her." Ronald told Logan to stop and Debbie left. Logan and Ronald went after her and talked with her. Logan cried and asked Ronald "if he did good."

It was Pete who ordered a pizza to lure a driver to the house. Amy arrived and Ronald told her to go to the back of the house. Pete had the pellet gun and Wyatt had the machete. When Amy went to the back, Pete gave the gun to Wyatt and tied Amy up with neckties. Amy was brought into Logan's father's bedroom. Wyatt touched Amy's breast and told Ronald to do the same. Ronald did not want to do it, but he complied because Wyatt threatened him with the machete. Logan then tried to break Amy's neck, but "didn't do well."

Ronald left the room. He went out to the car and followed Pete's instructions to pack it. Once he "popped into the room" again and saw "Logan and Wyatt kind of tormenting her on how they were going to kill her." Wyatt had a knife and said he would "slice her up"; Logan "said he would go along, as well."

Ronald, Pete, and Logan were waiting in the car while Wyatt was still inside the house with Amy. Wyatt came out to get the pills and said he was "going to overdose" Amy. After this, Wyatt returned and they drove away, heading for Nevada. Wyatt said Amy "should be dead by now" from the pills. On the way to Las Vegas, Logan "kind of fell into like a deep sleep for a while." After the police brought the boys back to Tulare County, Logan told Ronald he "was blacking out on some of the things" that happened, and Ronald had to tell him some of the facts.

Ronald said he participated in these events because he was afraid of the others. He thought Wyatt and Pete, in particular, would hurt him if he did not follow their instructions.

In her closing argument, Logan's trial counsel argued that the evidence showed "black-out intoxication" on Logan's part. She contended that "he was too drunk to form any specific intent to commit any crime."

The juvenile court found that none of the minors were intoxicated enough to support a defense of voluntary intoxication. As to Logan, the court sustained all counts of the petition.

A probation officer prepared a report for the disposition hearing and filed it in the juvenile court on July 30, 2013. The report mentioned that Logan was diagnosed with bipolar disorder and depression. He began receiving psychiatric medication for the first time while in custody for the current offenses. The medications were prescribed after Logan reported auditory hallucinations.

Before the offenses, Logan was having trouble coping with his parents' recent divorce and was not doing well in school. Logan said he chose to live with his father because his father had no rules and could be manipulated, unlike his mother. He reported that he and his sister were molested by their uncle when Logan was eight. The uncle was in prison. Logan's mother told the probation officer that the molestation incident had led to the divorce. Logan and all his siblings were referred for counseling, but Logan stopped going after three sessions. Instead, he used marijuana to cope. He said he began using marijuana when he was 11 and smoked two bowls daily. He got money to buy it by doing work for his grandmother. Six weeks before the offenses, he entered a counseling program and stopped using marijuana.

Logan told the probation officer that on the day of the offenses, he drank an entire bottle of liquor. It was the first time he had ever had alcohol. He claimed he blacked out and fell asleep a number of times during the events of that day. He admitted putting his aunt in a choke hold but denied remembering anything he might have done to Amy. He

11

told the probation officer he did not want his aunt to get hurt and came up with the idea of getting a car or plane tickets from a friend for this reason.

The probation officer concluded that "there are numerous aggravating factors and minimal mitigating factors" and recommended that the upper term of confinement be imposed, calculated as follows: count 1, attempted murder, 15 years to life; count 2, aggravated kidnapping, life with the possibility of parole; count 3, robbery, one year; count 4, criminal threat, 8 months; count 5, vehicle theft, 8 months; count 6, battery, 2 months; count 7, conspiracy to commit murder, 25 years to life. The probation officer stated that she considered recommending commitment to a local program but concluded that Logan should instead be committed to DJJ because "he is in need of a more substantial period of time in custody than the local services can provide, in order to adequately address his various issues."

Sharon Garcia, a DJJ parole manager, testified for the prosecution at the disposition hearing. She testified that DJJ wards first spend 45 to 60 days at a reception center, during which they undergo mental health and psychosocial evaluations. Based on these evaluations, DJJ designs an individual treatment program for each ward and assigns him or her to a facility and a housing unit suited to his or her needs. Correctional counselors have caseloads of four to six wards each, and case managers have a caseload of 18 wards each. DJJ has mental health units and staff psychiatrists and psychologists and can provide psychiatric medications. In addition to schools, DJJ has employment training and vocational training opportunities for wards.

The prosecutor posed a hypothetical based on the facts of Logan's case and asked Garcia whether the minor would benefit from the programs at DJJ. Garcia answered: "Yes, given [that] set of circumstances, yes, I believe we can provide that youth the intervention and cognitive base[d] therapy intervention that are evidence based within our facilities to provide some tools for them to regain, rehabilitate, and become a productive member of society." Garcia also testified that a case like Logan's "clearly fits into the

12

model of DJJ and the type of youth that we get, the type of youth that we treat," even though he had no prior criminal history.

Garcia testified that DJJ has jurisdiction of wards until a maximum age of 23. For a category one offense like Logan's, a baseline discharge consideration date (formerly known as a parole consideration date) is set seven years in the future. Credit for program participation can advance the discharge consideration date to a time earlier than seven years. A ward who receives all available credits might still serve three to four years before being considered for discharge. When the discharge consideration date arrives, the juvenile parole board decides whether the ward will be released.

Eric Ferguson, a supervising probation officer for Tulare County, testified for the defense. He discussed "the long-term program, which is also called the youth correctional center unit" operated by the county for juvenile wards. This program is for minors who have committed serious or violent offenses (among others) and involves a 365-day commitment. With "perfect behavior" a ward can be released after 36 weeks. In some instances, wards are committed to the program for more than 365 days; the longest commitment Ferguson was aware of was 18 months. Absent a violation of the law or of terms of probation, the program cannot hold wards for longer than 18 months. In addition to schooling, the program includes mental health counseling; drug, alcohol and anger-management training; and life-skills training and other components, but no job training. Ferguson said there were minors in the program who had committed offenses as serious as Logan's, including one of Logan's codefendants. All but a few of the wards in the program have committed Welfare and Institutions Code section 707, subdivision (b) offenses, i.e., offenses making them eligible for a DJJ commitment. (See Welf. & Inst. Code, § 733, subd. (c).) The program had two psychotherapists and also a psychiatrist who could provide psychiatric medication. Ferguson had not studied the facts of Logan's case and could not say whether the youth correctional center unit would be more or less suitable for him than DJJ. He did not disagree with the probation officer's recommendation of a DJJ commitment.

13

Dr. Shalila Douglas, a clinical psychologist for Tulare County's Special Case Investigation Unit (SCIU), testified for Logan. Douglas interviewed Logan, administered psychological tests to him, and prepared a report. She recommended that Logan be placed at the county's Juvenile Justice Center program (JJC) (which was his current placement at the time of the disposition hearing), with a transitional placement such as foster care upon his release. She also recommended mental health treatment, including therapy at least once a week. She conceded that she had "[v]ery little" familiarity with JJC's programs, but nevertheless believed Logan should continue there because she was informed he was doing well and a change of setting would be disruptive. She also felt it was "extremely important" for him to remain in local custody so he could be near his family. Douglas admitted she did not know what kinds of mental health programs were provided either at JJC or at DJJ, although she knew both had mental health programs of some kind.

The prosecutor asked Douglas whether she knew that Logan's mother had made statements minimizing the significance of the crimes and the impact on the victim. Douglas was aware of this:

> "Q. Were you aware that his mother was making statements indicating that this whole situation was blown out of proportion, it is not a big deal, nobody was hurt, the media wants to make a scapegoat out of him? [¶] She had no sympathy for the victim because she thinks she didn't seek treatment in this case, so she's exaggerating what happened to her. [¶] Were you aware she made those statements?

> "A. As listed in my report, yes, she did make some of those statements even to me. I did write in my report that it did appear that mom had limited insight."

Logan's mother, like Logan, had bipolar disorder; Douglas testified that she was seeking mental health treatment. Although Douglas believed it was important for Logan to be near his family, she was recommending foster care for a time upon his release because of issues like his mother's limited insight.

Logan testified at the disposition hearing. He said he got in trouble at JJC because he had stopped taking his medication. After he stopped taking it, he began hearing voices. One voice was named Lorden, and Logan considered it friendly. Logan said, "I trusted him. We talked." He reported this and received an evaluation. A doctor told him he had schizophrenia and obsessive compulsive disorder.

Logan also testified that he had attempted suicide while at JJC. He made a noose out of torn and braided bedsheets. On a prior occasion, before his incarceration, he tried to commit suicide by cutting his wrist with a broken bicycle spoke.

Logan's counsel asked him how he felt about what happened on April 4, 2013. Logan answered:

> "I feel—I feel—I don't—there's a lot of things I feel from it, but I usually ask myself to put myself, to kind of get more of a feeling of how much of an impact I had. I said what if that was my sister? What if that was my mother? How would I feel? [¶] So I understand everything that's going on and I do accept everything that I've done."

At the end of the disposition hearing, the prosecutor argued that a primary difference between a DJJ commitment and a county commitment was that at DJJ, Logan would receive intensive treatment and supervision for several years, while a county commitment would involve no more than 18 months of custody followed by long-term probation. Long-term probation, the prosecutor contended, could not reasonably be expected to provide sufficient structure to enable Logan to succeed, while DJJ's programs were designed specifically to provide adequate services for minors found to have committed the most serious crimes. If released too soon, he could "[make] the wrong friends again and [get] in trouble again, [and] the next thing we're going to be looking at is a very, very serious incarceration." A DJJ commitment would be the best disposition "to get him what he needs to make sure that he does not end up in prison for the rest of his life."

Logan's counsel argued that there were two main differences between a DJJ commitment and a local program: the length of time in custody and the proximity to

15

Logan's family. A 365-day stay in a county facility would be appropriate, she contended. She estimated that Logan's first parole hearing if he went to DJJ would take place when he would be 18 or 19 years old. She emphasized Douglas's testimony that being near his family would be very important for Logan. "The only reason we would be sending this young man to DJJ is to punish him, " counsel contended.

The court accepted the probation officer's recommendation for a DJJ commitment. It stated that the "biggest factor" was "the best chance for rehabilitation," and "almost of equal value" was "the safety of the community." The court did not "think we can accomplish what Logan needs in the resources we have locally." Logan needed "some very serious mental health intervention," including therapy and medication. The court was informed that Logan had been giving his medication to others and then asking for more. With respect to Logan's responsibility for his behavior in committing the offenses, the court indicated that it was not inclined to credit all that was said at the jurisdictional hearing about intoxication and out-of-character demeanor. "[A]t the time of the hearing I hear about all the alcohol issues and the rages and all these other things, yet at the time that law enforcement picked him up there was no discussion of raging, no discussion of alcohol or anything of that sort. So it looks like there's been some manipulation of that factor." The court also said, "[A]s counsel pointed out, this is a very serious offense. And I can't afford to not do everything in my power to try to keep it from reoccurring in any way, shape, or form."

The court also followed the probation officer's recommendation on the maximum confinement period: 40 years to life plus two years six months, calculated by aggregating the sentences for each count consecutively.

### *DISCUSSION*

I. *Sufficiency of evidence*

Logan argues that the juvenile court's findings that he committed the offenses was not supported by substantial evidence. In particular, he says the evidence of voluntary intoxication compelled a finding that there was a reasonable doubt about whether he had

16

the intent to commit any of the specific-intent crimes, i.e., all the offenses except the misdemeanor battery in count 6.

"When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

In this case, there undoubtedly was some evidence that Logan was drunk. The defense of voluntary intoxication requires more than evidence of drunkenness, however.

Evidence of voluntary intoxication is inadmissible to show that a defendant lacked *capacity* to form a required mental state (§ 29.4, subd. (a)) but can be admitted to show he did not *actually form* certain mental states, including specific intent (§ 29.4, subd. (b)).[4]

---

[4]Section 29.4 provides:

"(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific

17

(See also *People v. Mendoza* (1998) 18 Cal.4th 1114, 1128 [purpose of 1981 amendment to predecessor of § 29.4 was to eliminate defense of diminished capacity while preserving relevance of intoxication to actual mental state].)  The *total exclusion* of evidence of a defendant's voluntary intoxication in a case requiring proof of specific intent, therefore, would be error.  (*People v. Reyes* (1997) 52 Cal.App.4th 975, 985-986.)  Mere admissibility, however, naturally does not mean that evidence of intoxication always or even often has an important role.  What our Supreme Court said of juries in *Mendoza* applies equally to trial judges sitting as finders of fact:  "Evidence of intoxication, while legally *relevant*, may be factually unconvincing.  '[A]s with any evidence, the jury may give this testimony whatever weight it deems appropriate in light of the evidence as a whole.'  [Citation.]"  (*Mendoza, supra*, at p. 1134.)  To prevail on his sufficiency-of-evidence argument, Logan thus would not only have to show that the court had no reasonable choice but to credit the evidence of Logan's drunkenness; he would also have to show that any reasonable factfinder would be compelled to believe his intoxication was so severe that his formation of the intent required for each crime is subject to reasonable doubt, despite other evidence that he had the necessary intent in each instance.

The evidence as a whole does not support Logan's position.  To establish the required states of mind, the prosecution had to show that Logan acted with premeditation, willfulness, and deliberation in attempting to kill Amy, and that he had the specific intents to commit conspiracy to murder, kidnapping for robbery, robbery, a criminal threat, and vehicle theft.  Substantial evidence of all these states of mind was presented at the jurisdictional hearing.

---

intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.

"(c)  Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

Amy testified that Logan grasped her head and tried to twist her neck, saying she had to die. Logan and Wyatt objected when Pete suggested leaving Amy in the house alive. Then Logan left Wyatt alone with Amy and told Wyatt to "handle it," after which Wyatt tried to kill Amy with an overdose of pills. Detective Klassen testified that Logan admitted he tried to kill Amy by breaking her neck. Ronald told Klassen the four boys acted pursuant to a plan they devised to rob and kill a pizza delivery driver. All this was substantial evidence that Logan had the state of mind necessary to commit attempted first degree murder.

Ronald testified, and told Klassen, that the four boys planned to kill Debbie and take her car and money. Logan voiced his assent to this plan. Ronald saw Logan seize Debbie by the neck and tell the others to "get" her. Logan told Klassen that Wyatt formulated the plan to kill Debbie; he admitted to Klassen that he attacked Debbie after this plan was made. Debbie gave a description of the attack consistent with Ronald's description. This was substantial evidence that Logan had the state of mind necessary for conspiracy to murder Debbie.

Ronald testified that the four boys were acting pursuant to a plan they jointly devised to rob a pizza delivery driver. Amy testified that, while Logan and Wyatt were holding her in the bedroom, bound and blindfolded, they searched her person and found her car keys, then gave them to Pete, who moved Amy's car to the back of the house; later Logan and the others left in her car. This was substantial evidence that Logan had the specific intents necessary for kidnapping for robbery, robbery, and vehicle theft.

Amy testified that, in addition to threatening and trying to kill her, Logan also threatened to "cut up" her family if he got caught and she testified against him. This was substantial evidence that Logan had the specific intent necessary for making a criminal threat.

There was evidence that Logan was intoxicated. Ronald testified that Logan drank "a lot" of liquor, that it was Logan's first time, and that his behavior was unusual. The others had to restrain him at one point because he was trying to hurt them. Logan tried to

19

sleep at one point before they left and slept deeply in the car after they left. Debbie testified that she smelled alcohol on Logan, saw that his pupils were dilated, and thought he was acting as though he were intoxicated.

It was the juvenile court's task, as the finder of fact, to weigh the evidence of Logan's state of mind described above against the evidence of his intoxication and to decide whether the intoxication evidence raised a reasonable doubt about whether Logan formed the necessary mental states. We could disturb the court's findings only if the evidence as a whole would *compel* any reasonable finder of fact to find that a reasonable doubt existed. We conclude that it would not compel this.

Logan asserts that the court was compelled to find in Logan's favor on the basis of intoxication because he had never been charged with any offense before and because, being under 14, he was protected by section 26 and thus presumed incapable of committing crime absent clear proof that he knew the wrongfulness of his acts.

There is no support in logic or authority for the notion that if a minor was drunk when he committed a criminal act, and he had never been charged with an offense before, then his intoxication means he did not form the specific intent necessary for the crime. As for section 26 and the presumption favoring minors under 14, there was sufficient evidence to support a finding that Logan knew the wrongfulness of his acts. Klassen testified that he asked Logan and Ronald a series of questions pursuant to *Gladys R., supra*, 1 Cal.3d 855, and that their answers indicated they understood the wrongfulness of the acts and expressed remorse. Further, Debbie testified that Logan was apologetic after attacking her, indicating that he knew he had something to be sorry for. Amy said Logan threatened to attack her family if he got caught and she testified against him. This also was evidence that Logan had a consciousness of guilt. Logan points out that the court did not make any findings pursuant to *Gladys R.* on the record, implying that this was error. *Gladys R.,* however, does not state that any findings are required to be placed on the record, and Logan does not cite any other authority requiring this.

20

For all these reasons, Logan has not demonstrated that there was insufficient evidence to support the juvenile court's decision to sustain the charges in the petition.

## II.     *Commitment to DJJ*

Logan maintains that the juvenile court abused its discretion in choosing to commit him to DJJ.

In determining whether the juvenile court acted within its discretion in making its commitment decision, we indulge all reasonable inferences supporting the decision; we do not substitute our own judgment about which placement would be best; and we reverse only if the juvenile court's action exceeds the bounds of reason.  (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; *In re Khamphouy S.* (1993) 12 Cal.App.4th 1130, 1135.) We can affirm, however, only if the record contains evidence showing that there is a probable benefit to Logan from the discipline and treatment available at DJJ, and that less-restrictive alternatives would be ineffective or inappropriate.  (Welf. & Inst. Code, § 734; *In re Angela M., supra*, at p. 1396.)  Public safety, the need to hold the minor accountable for his behavior, the circumstances and gravity of the offense, the minor's previous delinquent history, and the minor's age are all proper factors for the juvenile court to consider; and there is no requirement that a commitment to a less-restrictive placement be tried before a DJJ commitment can be imposed.  (Welf. & Inst. Code, §§ 202, subds. (a), (b), 725.5; *In re Jimmy P.* (1996) 50 Cal.App.4th 1679, 1684; *In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)

In this case, the record does contain evidence showing probable benefits to Logan from the DJJ commitment.  Logan has been diagnosed with serious mental health conditions requiring ongoing medication and therapy, and the testimony at the disposition hearing supported the court's conclusion that DJJ has more robust mental health services than the local facilities have.  While in county custody during the pendency of the juvenile court proceedings, Logan did not comply with his medication regimen, and he attempted suicide.  Before the date of the offenses, Logan was offered psychological counseling but refused to participate.  He also attempted suicide before the date of the

21

offenses. These facts supported the view that Logan needs the more intensive mental health supervision available at DJJ and is likely to need in-custody supervision for a longer time than local programs provide. The evidence of issues in Logan's family, including his mother's own mental illness and her limited insight and his father's poor record as a disciplinarian, also supported that court's conclusion that an early release would not benefit Logan. The court could reasonably find that a post-release foster-care placement, as recommended by Dr. Douglas, would not be an adequate substitute for custodial supervision and treatment.

The circumstances and gravity of the offenses, and the need to protect public safety, also supported the disposition. Logan committed very serious offenses in the company of other minors while living under conditions created by his father of minimal household structure and discipline. If released within 18 months or less, as would happen in a county program, the circumstances that led to Logan's conduct would be more likely to recur, and the public would more likely be endangered again, just as the prosecutor argued at the disposition hearing.

Logan argues that the court followed the recommendation in the probation officer's report, and that this report "reflected a subjective bias and omitted crucial information favorable to the minor," among other deficiencies. We are not reviewing the quality of the probation officer's report, however. The question is whether the record as a whole supports the disposition. For the reasons we have stated, it does.

Logan also argues that the witness from DJJ, Ms. Garcia, "raised more questions than she answered." For instance, Garcia did not know the total number of psychologists or psychiatrists employed by DJJ and did not know how many times per week a DJJ ward might receive individual psychotherapy. Logan contends that, because of this, the court could not reasonably find the mental health services Logan would receive at DJJ would be superior to those he would receive in a county program, and the record failed to support the disposition "[b]ased on this factor alone."

22

We disagree.  Garcia's testimony indicated that DJJ would evaluate Logan's mental status during a 45- to 60-day evaluation period; would design an individual mental health treatment program for him; would assign him to a facility and housing unit based on his needs; would provide a ward-to-staff ratio of four or six to one; would continue treating him for several years; and would provide job training.  There was no comparable testimony about local programs.

Finally, Logan cites *In re M.S., supra,* 174 Cal.App.4th 1241, contending that the record in that case contained more information about various programs, enabling the court to make more thorough comparisons between them.  There is no authority, however, for the notion that *In re M.S.* establishes a minimum standard that appellate records must satisfy before a DJJ commitment can be affirmed.  The record is adequate in this case for the reasons given above.

## III.    *Section 654*

Logan maintains that the court erred when it did not apply section 654 to stay any portion of the maximum confinement period.  Section 654 provides, in part, as follows:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

This statute bars multiple punishments not only for a single criminal act but also for a single indivisible course of conduct in which the defendant had only one criminal intent or objective.  (*People v. Bauer* (1969) 1 Cal.3d 368, 376; *In re Ward* (1966) 64 Cal.2d 672, 675-676; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  We review under the substantial-evidence standard the court's factual finding, implicit or explicit, of whether or not there was a single criminal act or a course of conduct with a single criminal objective.  (*People v. Coleman* (1989) 48 Cal.3d 112, 162; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1408.)  As always, we review the trial court's conclusions of law de novo.  (*Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1687.)

23

In this case, we are dealing with multiple counts arising from a series of acts, not a single act, so the question is whether the acts had one criminal objective or several criminal objectives. Logan argues that he had only one objective with respect to all counts (except possibly count 6, misdemeanor battery against Debbie): "to procure a vehicle and money to flee the State of California in order to avoid capture for the initial residential burglary."

We disagree. The question is not whether appellate defense counsel can formulate a single phrase arguably encompassing everything a defendant was trying to do. The question is only whether the evidence is sufficient to support the juvenile court's finding, express or implied, that there was a separate objective for each separate component of the term the court specified.

The bulk of the maximum confinement term—all but two years and six months— was based on counts 1, 2, and 7. In our view, the evidence is sufficient to support findings of each of the following objectives for those counts. For count 1, attempted murder, Logan had the objective of avoiding detection of the other offenses he committed. He said Amy had to die since otherwise she would help the authorities catch and punish him for helping to kidnap and rob her. For section 654 purposes, avoidance of detection of one crime has been held to be a separate objective for the commission of another. (*People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657-1658.) For count 2, kidnapping to commit robbery, the objective was to obtain a car and money with which to flee California.

For count 7, conspiracy to commit murder, the objectives were also to avoid detection and to obtain a car in which to flee, but count 7 had a different victim: Debbie. It is well established that two crimes with different victims are not to be considered to be based on the same objective or same act for section 654 purposes. (*People v. Miller* (1977) 18 Cal.3d 873, 885-886, overruled on other grounds in *People v. Oates* (2004) 32 Cal.4th 1048, 1067, fn. 8; *People v. Young* (1992) 11 Cal.App.4th 1299, 1311-1312.)

Logan asserts that count 7 was based on a conspiracy to murder Amy, not Debbie. The petition, however, stated that count 7 was a conspiracy to murder Debbie, as explained in footnote 3 above. Logan claims that the juvenile court thought it was making a determination, as the basis of its true finding for count 7, that Logan conspired to kill Amy, but the sole support for this claim is the following remark by the court: "The Court has no doubt that they all agreed to rob and kill the pizza driver and take the car. Based on that factor, that satisfies most of the counts." This statement about "most of the counts" simply does not say what the basis of count 7 is. The petition alleged in count 7 that Logan conspired to kill Debbie, the evidence supported that allegation, and the court found the allegation true. The record thus is sufficient to support a finding that count 7 had a different victim from counts 1 and 2.

We do not find sufficient support in the record for separate objectives for counts 3, 4, 5, and 6. The objective for counts 3 and 5, robbery and vehicle theft, was to take Amy's money and car, the same as the objective for the kidnapping for robbery in count 2. The objective for count 4, criminal threat, was to stop Amy from going to the authorities, the same as the objective for the attempted murder in count 1. Count 6, misdemeanor battery against Debbie, had the same objective as count 7, conspiracy to murder Debbie. Logan grabbed Debbie as part of the means of taking her car to flee and killing her to avoid detection. We will order the maximum confinement period modified to include a stay on the portion (two years six months) based on these counts and will affirm the judgment with this modification.

## IV.   *Consecutive terms*

Logan urges us to conclude that the trial court acted improperly when it imposed consecutive rather than concurrent terms when it calculated the maximum confinement period. We disagree.

"It is well established that a trial court has discretion to determine whether several sentences are to run concurrently or consecutively. [Citations.] In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on

25

appeal. [Citation.] Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) Multiple victims properly may be considered an aggravating factor in deciding whether to impose concurrent or consecutive terms. (*People v. Valenzuela* (1995) 40 Cal.App.4th 358, 365.) The trial court could also take into account the aggressive nature of the attack. (See *People v. Williams* (1996) 46 Cal.App.4th 1767, 1782 ["viciousness" of crime was appropriate aggravating factor for imposing upper term].)

In this case, the trial court could reasonably conclude that Logan's conduct in committing the offense was both aggressive and vicious. We see nothing in the record to indicate that the trial court's decision exceeded the bounds of reason.

Logan's brief sets forth several proposed reasons why the trial court should have imposed concurrent terms. Logan says he was intoxicated and had no prior delinquent history. He says juveniles have diminished culpability because of their unformed characters, lack of maturity, and susceptibility to influence. And he claims he must not have "fully intended" to kill Amy because various means to do so were available to him yet he did not kill her.

These are only reasons why Logan thinks it would have been more suitable to impose concurrent terms than consecutive ones. (One of those reasons, the view that Logan did not intend to kill, is also inconsistent with the court's jurisdictional findings.) We cannot disturb the judgment merely because we might have made a different decision, or reasons supporting a different decision are available. The court's exercise of discretion can be reversed only if it exceeded the bounds of reason. It did not. Given the seriousness of the offenses and the nature and extent of Logan's direct participation, the imposition of consecutive terms fell within the scope of the court's discretion.

## V.    *Statement of reasons for confinement period*

Logan avers that the juvenile court should be required to make a statement on the record of the reasons underlying its choice of a maximum confinement period. He notes

that the court had discretion to impose a period less than the maximum that could be imposed on an adult offender (Welf. & Inst. Code, § 731, subd. (c)) and urges us to remand with directions to the court to say why it did not do this.

Logan does not claim any existing authority requires this. Instead, he contends that due process considerations support the creation of such a requirement, since courts sentencing adult offenders are subject to a similar requirement (see § 1170, subd. (b)), and the reasons supporting that requirement apply to minors as well as adults.

As Logan acknowledges, our Supreme Court rejected a closely related argument in *In re Julian R.* (2009) 47 Cal.4th 487. Julian R. argued that, just as a court must by statute make an oral pronouncement of the sentence when sentencing an adult offender, a juvenile court should be placed under an obligation to make an oral pronouncement of a delinquent ward's maximum confinement period. (*Id.* at p. 496.) Our Supreme Court held that, even though statutory changes had added an emphasis on punishment as a purpose of juvenile delinquency judgments, significant differences remained between the adult and juvenile systems that supported the existence of divergent procedures:

> "[The juvenile system] seeks to rehabilitate, while the [adult system] seeks to punish. The determinate sentencing law, which governs sentencing of adult offenders who have committed a crime for which a 'statute specifies three possible terms,' requires the trial court to choose a set term (Pen. Code, § 1170, subd. (b))—a lower, middle, or upper term—from the adult tripartite sentencing scheme. The determinate sentencing law 'provides for *fixed terms* designed to punish.' [Citation.] In contrast, juveniles are committed 'for *indeterminate terms* designed to rehabilitate.' [Citation.] And unlike an adult offender who commits a felony and serves a set term, a juvenile offender who commits a felony and is committed to the Division of Juvenile Justice is ordinarily not held beyond the age of 25." (*In re Julian R., supra*, 47 Cal.4th at pp. 496-497.)

Julian R. also made the argument Logan makes—that due process requires a statement of reasons in addition to the oral pronouncement. Our Supreme Court declined to address that argument on the ground that Julian R. did not make it in the Court of Appeal. (*In re Julian R., supra*, 47 Cal.4th at p. 497, fn. 3.) Our Supreme Court went on to reject a separate argument that the juvenile court's failure to make a statement of

27

reasons on the record should be presumed to mean the juvenile court failed to carry out its duty to consider whether the facts warranted a maximum confinement period shorter than the maximum sentence that could be imposed on an adult. This argument overlooked the principle that a lower court's judgment is presumed correct on appeal, and error must be affirmatively shown by the record. (*Id.* at pp. 498-499.)

We can see no reason why due process would require a statement of reasons on the record if it does not require oral pronouncement and if a silent record is presumed to mean the court did its duty. The reasons on which our Supreme Court relied in rejecting the proposed oral-pronouncement requirement appear to us to apply with equal force to the proposed statement-of-reasons requirement. Consequently, we decline to create this requirement.

## *DISPOSITION*

The judgment is modified to stay the portions of the maximum confinement period that are based on counts 3, 4, 5, and 6. As a result, the maximum confinement period is reduced from 40 years to life with the possibility of parole plus two years six months to 40 years to life with the possibility of parole. The juvenile court is directed to modify its commitment order accordingly and to forward the modified order to the appropriate juvenile authorities. The judgment is affirmed with this modification.

_____
Smith, J.

WE CONCUR:


_____
Detjen, Acting P.J.


_____
Peña, J.